# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Joseph Pagliolo, Debra Anderson, Robert Avery,
Brian Bowen, Hannelore Brandner, Vicki Brotzel,
Greg Cardoza, Bruce Cerwin, William Colby-Newton,
James Craig, George Crunkleton, Thomas Davis,
Tracy Davis, Daniel Dewar, Antonio Duarte, Robert
Esselstein, Dale B. Evans, Dale M. Evans, Kim Farmer,
Linda Gregerson, John Hayes, Michael Horton, Robert
Hughes, Beverly Johnson, Craig Johnson, Monica Joynt,
Patrick Kelley, Urania Lima, Stuart Lindenberger,
Curt Lindstrom, Henry Luber, Lori Lynch, Frank
Malenowski, Jr., Kenneth Malmstedt, Judy Mathiowetz,
Theodore Melzer, Edward Milner, Jr., Kathleen Mischke,
Thomas Morin, Robert Odland, Janis Olson, Timothy
Owens, Roy Pendley, Eric Penn, Maurice Ranasinghe,
Yvonne Rickabaugh, Lynn Robeck, John Anthony
Saldana, Shahin Sarkissian, Sylvia Sieferman, Robert
Thurston, Armando Torrez, Jeri Troiden, Frank Trojan,
Theresa Vimr, Ted Wardein, Donald Wells, David
White, Patricia Wilke, Jeanine Yates, James Yost,
for and on behalf of themselves and other persons
similarly situated,

Civil No. 06-943 (DWF/SRN)

       Plaintiffs,

v.

Guidant Corporation, an Indiana Corporation, Guidant
Endovascular Solutions, Inc., an Indiana Corporation;
Guidant Sales Corporation, an Indiana Corporation;
Advanced Cardiovascular Systems, Inc., a/k/a
Guidant Vascular Intervention, a California
Corporation; and Cardiac Pacemakers, Inc.,
a/k/a Guidant Cardiac Rhythm Management,
a Minnesota Corporation,

       Defendants.

**MEMORANDUM
OPINION AND ORDER**

Cynthia Stange, Esq.; Frank T. Mabley, Esq., Greenstein Mobley & Wall; Patricia V. Pierce, Esq.; and Wood R. Foster, Esq., Jordan M. Lewis, Esq., and Jay B. Streitz, Esq., Siegel Brill, Greupner, Duffy & Foster, P.A., counsel for Plaintiffs.

Daniel G. Prokott, Esq., Holly M. Robbins, Esq., and Jerry W. Snider, Esq., Faegre & Benson, LLP, counsel for Defendants.

## INTRODUCTION

This age-discrimination action is before the Court pursuant to cross-motions for summary judgment.  For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' Partial Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment.

## BACKGROUND

In 2004, at least six of the corporations that then comprised "Guidant" simultaneously conducted a reduction in force ("RIF").[1]  At that time, Guidant Corporation ("Guidant Corporate") was the parent company of several businesses, including United States subsidiaries Guidant Endovascular Solutions, Inc. ("ES"), Guidant Sales Corporation ("GSC"), Guidant Vascular Intervention ("VI"), and Guidant Cardiac Rhythm Management ("CRM") (collectively with Guidant Corporate, "Guidant").  Guidant Corporate also included several international businesses.  Guidant designed and manufactured pacemakers, implantable defibrillators, intercoronary stents,

---

[1]      In April 2006, Boston Scientific acquired Guidant.

(Footnote Continued on Next Page)

angioplasty catheters, and other medical devices and accessories.  Plaintiffs are former Guidant employees whose employment was terminated in 2004 as a result of the RIF.

In 2004, Guidant employees worked at 84 different facilities.  Plaintiffs worked at 9 of the 84 facilities.  Guidant's 20 primary facilities at that time included:  Indianapolis, Indiana; Arden Hills, Minnesota; Temecula, California; Santa Clara, California; Houston, Texas; Redmond, Washington; Freemont, California; Menlo Park, California; and 12 Regional Sales Offices located in various cities.  A centralized senior management committee, known as the Guidant Management Committee ("GMC") oversaw Guidant's United States-based businesses.  The GMC was comprised of the presidents of each of the United States-based businesses, Guidant Corporate, and the most senior managers of shared service departments such as Human Resources, Finance, Legal, Information Systems, and Compliance.  The GMC met on a regular basis to oversee and direct the operations of the combined businesses.

In the first half of 2004, Guidant experienced an unanticipated shortfall in actual and projected revenues from its vascular intervention business.  By late spring 2004, the GMC thought it was clear that Guidant Corporate would fail in large measure to meet its 2004 financial goals.  The GMC concluded that the entire Guidant organization needed to implement cost reductions in order to meet Guidant Corporate's financial goals.  The GMC concluded that all of its United States-based businesses would participate in

(Footnote Continued From Previous Page)

cost-cutting measures, including the RIF.  Due to the sensitive nature of the RIF, Guidant

gave the RIF the code name "Project Apple."

The corporate Vice President of Human Resources, Roger Marchetti, worked with

several human resources vice presidents and senior human resources managers of the

various businesses to design the RIF.  In July 2004, Guidant implemented the RIF on a

company-wide basis in the United States.  Marchetti, along with Vice President of Human

Resources Doug Wilson, Human Resources Manager Mary Beth Conzett, and Human

Resources Analyst Pam McKechnie, managed the implementation of the RIF.  Guidant

informed managers and directors at the business unit level of the planned reductions on

approximately July 26, 2004.  Although not every department in every

United States-based business ultimately reduced staff, every department was required to

examine how to reorganize and reduce staff.  Guidant made all RIF selections between

July 26 and August 6, 2004.  Guidant selected employees for the RIF at the local level

based on job performance and criticality of jobs to the future success of the organization.[2]

 Guidant did not ask for or accept volunteers for the RIF.

Guidant considered more than 8,700 employees for the RIF, and ultimately

_____

[2]      Although Guidant admits in its brief that it selected employees for the RIF based
on job performance and criticality, not all of its witnesses support this assertion.  (*See*
Defs' Mem. of Law in Supp. of Their Mot. for Summ. J. at 9.)  For example, Guidant
Vice President Wilson testified that performance was not a criteria used to select
employees for the RIF.  Instead, Wilson testified that Guidant only considered job
criticality when selecting employees.

(Footnote Continued on Next Page)

informed more than 700 employees that Guidant intended to terminated their

employment.  Guidant gave those employees notice that they were eligible for benefits in

connection with the RIF.  Conzett tracked the termination decisions of Guidant Corporate

and the various United States-based businesses by using a spreadsheet (the "Project Apple

Spreadsheet") that contained a line of information for each of the almost 8,800 United

States-based employees who were considered for the RIF.  The Project Apple

Spreadsheet included 72 columns of information for each individual, including each

employee's name, address, salary, performance information, and manager, as well as birth

date, job title, and severance eligibility.  Almost all employees were notified of their

employment terminations in individual meetings conducted on August 9 and 10, 2004.[3]

On the day they were notified of their employment termination, Guidant gave

impacted employees notice that they would be eligible to receive severance benefits by

participating in the Guidant Severance Pay Plan (the "Severance Plan").  In exchange for

receiving severance benefits, Guidant asked employees to release it from

employment-related claims, including claims under the Age Discrimination Employment

Act ("ADEA").  Guidant gave employees the following documents:

---

(Footnote Continued From Previous Page)

[3]      Guidant notified some GSC employees of their employment terminations on
July 26, 2004.

(1)    a cover letter explaining the termination ("August letter");
(2)    a draft Severance Agreement and Release of Claims ("Sample Release");
(3)    a draft Notice of Scheduled Termination Date and Statement of Severance Pay and Benefits ("Sample Exhibit A");
(4)    a draft Severance Eligibility Disclosure ("Sample Exhibit B");
(5)    a copy of the Severance Plan;
(6)    a document called Reduction in Force Impact to Benefits; and
(7)    a document entitled "Questions and Answers about Severance Benefits."

The Sample Release and Sample Exhibit A were each marked with the words "Informational Purposes Only – Do Not Sign."  Sample Exhibit A was a draft of the final document that would later be provided to the employee.  In Sample Exhibit A, Guidant explained the benefits it would offer each employee in exchange for signing the final Release, including a severance amount tailored to the individual employee.  Sample Exhibit B was a sample disclosure, which delineated the information that Guidant would disclose at the beginning of the consideration period.  Guidant also provided a copy of the Severance Plan.

Plaintiffs remained Guidant employees for 60 days after Guidant first notified the employee that it was terminating their employment, but most did not work for Guidant during this time.  During that period, employees could seek other jobs within Guidant.  Guidant offered some employees redeployment to functionally non-equivalent positions.[4]  The employees who were offered redeployment could decide whether to accept such redeployment and decline severance benefits or decline redeployment and accept

---

[4]    A "functionally non-equivalent position" refers to a Guidant job that required a move, a demotion, or an otherwise significant change in the terms and conditions of an

(Footnote Continued on Next Page)

severance benefits.  At the end of the 60-day period, Guidant delivered a second packet of

documents to each terminated employee.  The second set of documents consisted of a

different cover letter, a new copy the Severance Agreement and Release of Claims (the

"Release"), and Exhibits A and B ("Exhibit A" and "Exhibit B," respectively).  Exhibit B

is at issue in the motions before the Court.

Exhibit B consists of a short introductory page and a 184-page list of 8,791 lines of

job titles, subtitles, and birthdates from which it identifies 721 lines as eligible for

severance.  The Project Apple Spreadsheet was the source for information included in

Exhibit B.  Exhibit B states in part,

> Federal law requires that CRM provide certain information to you in
> connection with CRM's offer to provide Severance Pay and Benefits in
> exchange for a Severance Agreement and Release of Claims.  This
> Disclosure sets forth information required by federal law with respect to
> each employee described in paragraph 2, above, who, as of the time you
> receive this Disclosure, has been offered the opportunity to participate in
> the Plan, or who has been identified as someone who will not be offered the
> opportunity to participate.  Each employee is listed by position (job title),
> date of birth, and a statement whether the employee is eligible for benefits
> under the Plan in exchange for the employee entering into a Severance
> Agreement and Release of Claims.

(Aff. of Wood R. Foster, Jr. in Supp. of Pls.' Mem. in Supp. of Mot. for Partial Summ. J:

Invalidity of Releases ("Foster Aff."), Ex. 1 at ¶ 3.)

Pursuant to the Release, Guidant gave employees 45 days to consider the Release

and directed employees to speak with a lawyer before signing it.  Guidant also gave

---

(Footnote Continued From Previous Page)
employee's employment.

7

employees seven days to revoke the Release after signing.  After signing and not revoking the Release, employees received severance benefits under the Plan consistent with the severance amount represented to each impacted employee in Exhibit A.

Joseph Pagliolo was the only one of the 59 Plaintiffs in this case who did not sign a release of potential Age Discrimination in Employment Act ("ADEA") and other claims in return for severance benefits.  Instead, Pagliolo used the information contained in Exhibit B to conduct an analysis that led to his decision not to sign the Release.  Specifically, Pagliolo entered the birth dates from Exhibit B into an Internet calculation program, which performed statistical calculations that purportedly determined the relative impact that the RIF had on employees above and below age 40.  According to Pagliolo, the calculations that he performed showed that employees age 40 and older were affected disproportionately by the RIF.  Pagliolo admitted in his deposition that Exhibit B provided him with the information he needed to make an informed decision about whether to sign the Release and accept the severance benefits offered by Guidant.

On May 1, 2006, Plaintiffs filed this lawsuit, alleging age discrimination in violation of the ADEA, 29 U.S.C. § 621, *et seq.*  According to Plaintiffs, terminations of employees 40 years of age and older constituted almost 70% of all terminations even though employees over 40 made up less than half the workforce displayed in Exhibit B.  Plaintiffs seek declaratory judgment under 28 U.S.C. § 2201 that the Severance Agreement and Release of Claims is invalid under the Older Workers Benefits Protection Act ("OWBPA").  In response, Guidant counterclaims for:  (1) declaratory judgment

under 28 U.S.C. § 2201 that the Severance Agreement and Release of Claims is valid

under the OWBPA; (2) unjust enrichment; (3) restitution, recoupment and setoff; and

(4) breach of contract.

The parties now move for summary judgment on the validity of the Release.

Specifically, Plaintiffs seek declaration that the Releases failed to comply with the

OWBPA and are therefore invalid.  Plaintiffs also request that the Court grant summary

judgment on Guidant's counterclaims and releases that rest on the validity of the Release.

Conversely, Guidant asserts that the Release and accompanying disclosures satisfy the

OWBPA standards, and therefore, requests that the Court grant summary judgment in its

favor as to each Plaintiff who signed the Release and therefore waived his or her age

discrimination claims.

## DISCUSSION

## I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court

must view the evidence and the inferences, which may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank

of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rely upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Validity of Guidant's Release Under the OWBPA

The parties dispute whether Exhibit B violates the OWBPA. Enacted in 1990, Congress clarified in the OWBPA the protections afforded older workers under the ADEA. Pub. L. 101-433, 104 Stat. 978 (1990). Under the OWBPA, an individual may not waive any right or claim under the ADEA unless the waiver is knowing and voluntary. 29 U.S.C. § 626(f). A waiver may not be considered knowing and voluntary unless "at a minimum" the waiver satisfies a number of specific statutory requirements. *Id.* "The statutory requirements for waiver of ADEA claims are strict and unqualified; if an employer fails to meet any of the statutory requirements, the waiver is ineffective as a matter of law. *Thomforde v. Int'l Bus. Machs. Corp.*, 406 F.3d 500, 503 (8th Cir. 2005) (citing *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427, (1998)). The OWBPA

provides:

> Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum-
>
> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual . . . ;
>
> (B) the waiver specifically refers to rights or claims arising under [the ADEA];
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; . . .
>
> (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired.
>
> (H) if a waiver is requested, in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to
>> (i) any class, unit or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and
>> (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1).  Plaintiffs assert that Guidant failed to comply with subsections (A)

and (H).  Specifically, Plaintiffs assert that Exhibit B contains material

misrepresentations, fails to describe the affected "decisional unit" with particularity, fails

to disclose the eligibility factors, and ignores regulatory formatting requirements.[5]

Guidant asserts that the waiver satisfies the requirements of subsections (A) and (H).

### A.     Material Misrepresentations

Plaintiffs assert that Exhibit B fails to satisfy the OWBPA because it contains

material misrepresentations.  The Department of Labor ("DOL") has promulgated

regulations that supplement and clarify the OWBPA.  The regulations state in relevant

part:

> Other facts and circumstances may bear on the question of whether the
> waiver is knowing and voluntary, as, for example, if there is a material
> mistake, omission, or misstatement in the information furnished . . .

> The waiver agreement must not have the effect of misleading, misinforming
> or failing to inform participants and affected individuals.

---

[5]     Plaintiffs also point out that Plaintiff George Crunkleton, a former GSC account
manager, received different versions from other employees of both the preliminary and
final versions of Exhibit B.  Specifically, the finalized Exhibit B that Guidant sent
Crunkleton was only 140 pages and contained almost 3,000 lines less than the Exhibit B
sent to other employees.  Guidant admits that it prematurely sent Crunkleton an
incomplete draft of Exhibit B, but asserts that at best, this inconsistency creates a question
of fact related solely to Crunkleton's Release.  The Court rejects Guidant's assertion that
a question of fact exists regarding the validity of Crunkleton's Release.  The Court finds
that Crunkleton's Release was invalid as a matter of law because the Release did not
comply with the specific requirements of the OWBPA.  *See* 29 U.S.C. § 626(f)(1)(H)(ii)
(requiring that the employer disclose in writing "the job titles and ages of all individuals
eligible or selected for the program, and the ages of all individuals in the same job
classification or organizational unit who are not eligible or selected for the program."

29 C.F.R. §§ 1625.22(a)(3) and (b)(4).

Plaintiffs assert that Exhibit B falsely overstated the number of terminations by at least 180 and perhaps as many as 196 and thereby understated the percentage of employees over 40 who were terminated.  Plaintiffs point out that the Project Apple Spreadsheet reveals that up to 196 of the Guidant employees who were identified as severance eligible on Exhibit B were in fact redeployed to functionally non-equivalent positions—that is they took new jobs at Guidant.   Plaintiffs assert that Guidant did not terminate these employees' employment and therefore contend that these employees were categorically disqualified from receiving severance benefits under the Plan.  Thus, Plaintiffs assert that Guidant made a material misrepresentation by identifying these employees as eligible for participation in the Severance Plan.  Plaintiffs contend that this alleged material misrepresentation of the number of terminated employees affected over 25% of the individuals identified on Exhibit B as being "severance eligible."  Plaintiffs contend that when those extra 180-196 people are omitted, the percentage of employees over 40 who were terminated is heightened by 10 percentage points.

In response, Guidant contends that had it not identified these 180-196 employees as severance eligible, it would have failed to comply with the OWBPA.  Guidant contends that it is undisputed that every employee to whom Guidant offered redeployment to a functionally non-equivalent position was also given the opportunity to sign the Release in exchange for severance benefits.  According to Guidant, it is of no consequence for OWBPA compliance that some employees ultimately rejected the offer

of severance benefits and accepted redeployment.   Therefore, Guidant disclosed such

employees on Exhibit B because they were eligible at one time to accept or decline the

severance package.   Accordingly, Guidant asserts that it complied with the OWBPA's

requirement that it identify those who are eligible to participate in the program under 29

U.S.C. § 626(f)(1)(H)(i)-(ii).

The Court finds that Guidant's representation on Exhibit B that the 180-196

employees who were redeployed were eligible for severance benefits constitutes a

material misrepresentation and therefore invalidates the Release.   Based on the language

of the Severance Plan, it was a material misrepresentation to identify these employees as

eligible for severance benefits on Exhibit B.   The Severance Plan states that it "provides

benefits only in the event of a Qualifying Termination."   (Foster Aff., Ex. 9 at ¶ 4.)   It

further states that "[i]f your employment with Guidant terminates due to a Qualifying

Termination, and you are a participant in the Plan as of your termination date, you will be

entitled to receive benefits under the Plan if you satisfy the conditions specified in the

Plan."   (*Id.*)

The Severance Plan defines a "Qualifying Termination" as "a termination of regular employment with Guidant due to a permanent reduction in force or the elimination of your job or position." (*Id.*) Further, the Severance Plan delineates that an employee will not have a qualifying termination "if, either before or after you receive a Notice, you accept an offer of employment in another position with Guidant, or you decline an employment offer from Guidant for a position that Guidant considers to be functionally equivalent to your current position and that will not require you to relocate." (*Id.*) Thus, according to the Severance Plan, a qualifying termination does not occur until an employee's position is terminated and that employee has not been offered or accepted redeployment. Here, the 180-196 people offered functionally non-equivalent positions chose to accept such redeployment. By doing so, these 180-196 people did not have a qualifying termination and were therefore not eligible for severance benefits.

Additionally, based on Exhibit B's introductory language, it was a material misrepresentation to identify these employees as eligible for severance benefits. Exhibit B states, "Each employee is listed by position (job title), date of birth, and a statement whether the employee *is eligible* for benefits under the Plan in exchange for the employee entering into a Severance Agreement and Release of Claims." (Foster Aff., Ex. 1 at ¶ 3 (emphasis added).) Thus, Guidant represented on Exhibit B that these 180-196 people were eligible for benefits at the time each employee received Exhibit B. But by the time Guidant delivered Exhibit B—60 days after the initial employment terminations,

these 180-196 employees had accepted redeployment and were no longer eligible for benefits.

The identification of these employees as eligible for severance benefits on Exhibit B constitutes a material misrepresentation.  This material misrepresentation had the effect of making it appear on Exhibit B that there were about 10% percent fewer terminations of employees 40 and older than were actually terminated.  If Guidant wanted to include these employees in Exhibit B, it needed to note that although these employees were offered participation in the Plan, they ultimately accepted redeployment within Guidant and therefore declined to participate in the Plan.  The Court finds that these material misrepresentations render the Release invalid and therefore the Court grants summary judgment in favor of Plaintiffs.

### B.     Decisional Unit

Next, Plaintiffs contend that the Release is invalid because:  (1) Guidant failed to properly disclose the decisional unit for the RIF; and (2) Guidant's claimed decisional unit was not legitimate under the OWBPA or corresponding regulations.  The OWBPA states in relevant part:

> a waiver may not be considered knowing and voluntary unless at a minimum . . . the employer . . . informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to (i) any class, unit, or group of individuals covered by such program[.]

29 U.S.C. § 626(f)(1)(H)(i).  The regulations use the term "decisional unit" to describe the "class, unit, or group" and define the decisional unit as:

16

that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver.  The term "decisional unit" has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program.

29 C.F.R. § 1625.22(f)(3)(i)(B).  The regulations specify that the employer acts on a

case-by-case basis when identifying the population of the decisional unit.  29 C.F.R.

§ 1625.22(f)(3)(ii)(A).

### i.   Disclosure

Plaintiffs first contend that Guidant violated the OWBPA per se by failing to

describe the decisional unit in Exhibit B or any other document.   In response, Guidant

asserts that it disclosed the decisional unit in Exhibit B by listing nearly all

United States-based employees in that exhibit.  Guidant asserts that these employees were

covered by the program and thus considered for termination in the RIF and for eligibility

in the Severance Plan.  As such, Guidant contends that it informed the impacted

employees of that portion of its organizational structure from which it chose the persons

to be eligible for the Severance Plan.  Additionally, Guidant contends that Exhibit B

informed employees of the applicable decisional unit by referencing the Severance Plan,

which Guidant contends describes the decisional unit.  In particular, Guidant notes that

the Plan Glossary defines "Guidant," stating, "Guidant includes the Company and its

subsidiaries and affiliates that (1) are incorporated in the United States, and (2) are

owned, directly or indirectly, at least 80% by the Company."  (Foster Aff., Ex. 9 at ¶ 10.)

The Court finds that Guidant violated the OWBPA by failing to disclose the decisional unit.  The Court finds that listing nearly all United States-based employees in Exhibit B does not disclose the decisional unit in a manner calculated to be understood by the average individual eligible to participate in the Severance Plan.  Additionally, the Court rejects Guidant's argument that Exhibit B's reference to the Severance Plan constituted a proper disclosure of the decisional unit.  It is unreasonable to expect employees to know that they should look up the word "Guidant" in the Severance Plan's Glossary when nothing in Exhibit B suggests that they do so.  Further, even if an employee looked up the definition of "Guidant," in the Glossary, he or she must know or discover which Guidant subsidiaries are incorporated United States corporations and which related United States corporations are owned 80% or more by Guidant.  The Court finds that Guidant's purported disclosure fails to satisfy the OWBPA.  Accordingly, the Court finds that the Release is invalid and therefore grants summary judgment in favor of Plaintiffs.[6]

---

[6]   Plaintiffs also contend that Guidant failed to disclose that 25 high-level employees were exempt from the RIF and therefore not included in Exhibit B.  In response, Guidant asserts that it is self-evident that these employees were not included in the decisional unit because "President," "Chief Operating Officer," "Vice President, Human Resources," and several other "Vice President" job titles do not appear in Exhibit B.  The Court finds that any failure to disclose that these 25 employees were not included in Exhibit B out of almost 8,800 employees was immaterial as a matter of law and does not invalidate the Release.

### ii.     Composition

Next, Plaintiffs contend Guidant's claimed decisional unit is not legitimate under

the regulations because Guidant:  (1) improperly aggregated parts of separate

corporations into a single decisional unit; and (2) improperly aggregated numerous

facilities into a single decisional unit.  Plaintiffs further contend that even if employees of

all Guidant corporations could legitimately be lumped together, Guidant arbitrarily

excluded thousands of employees from Exhibit B.

In response, Guidant asserts that the decisional unit it allegedly disclosed in

Exhibit B is legitimate under the OWBPA regulations.  Guidant contends that the RIF

affected facilities across the country and included every United States-based business.

Therefore, Guidant contends that the appropriate decisional unit needed to reflect the

undisputed fact that Guidant selected employees for the program from facilities across the

country and all of its United States-based businesses.  Further, Guidant asserts that it did

not improperly exclude certain employees in Exhibit B.

The Court finds that it was improper to combine the employees of the six

corporations in question into one decisional unit.  Nothing in the statute suggests that

multiple corporations can be combined to constitute one decisional unit.  Here, there were

six separate employers and each one should have been a separate decisional unit.  The

various termination letters and Releases reveal that the official communications varied

among the corporations.  Thus, an average terminated employee could not be expected to

know which corporations were included in Exhibit B.  Accordingly, the Court finds that the Release fails on this basis.

Additionally, the Court finds that the decisional unit should have been limited by facility.  Here, there were 84 domestic facilities at which employees worked.  It is unreasonable to expect that an individual at any one of these facilities could draw any meaningful conclusions from Exhibit B when it does not disclose any information regarding employees' locations.  The Eleventh Circuit Court of Appeals' recent decision in *Burlison v. McDonald's Corp.*, 455 F.3d 1242 (11th. Cir. 2006), is instructive.

In *Burlison*, McDonald's reduced its workforce by about 500 employees nationwide in 2001.  455 F.3d at 1244.  McDonald's also restructured its business operations, including merging the former Atlanta region with the former Nashville and Greenville regions to form a new Atlanta region.  *Id.*  Out of 208 employees in the former Atlanta, Nashville, and Greenville regions, McDonald's discharged 66 employees.  *Id.* The court rejected the plaintiffs' OWBPA challenge because McDonald's had included region-specific information sheets with the releases that listed job titles and ages of the 208 employees in the three former regions and identified which of those employees had been selected for discharge and offered severance packages and which of those employees were not being discharged.  *Id.*

The court agrees with McDonald's that the OWBPA requires employees to provide information about "only those workers within a departing employee's "decisional unit" and not job titles and ages of all employees nationwide who were terminated.  *Id.*

The court stated that, "[i]nformation about who was terminated out of a *national* universe

is not comparable to data about who was not selected for firing from a *local*

unrepresentative subset." *Id.* at 1247 (emphasis in original).  The court further stated that,

"[t]he Appellees' decisional unit is in no way representative of McDonald's

pre-termination workforce; any conclusions drawn from it inevitably will contain

statistical bias"  and that "[t]his is especially true here where *local* managers played key

roles in the decision." *Id.* at 1248 (emphasis in original).  Here, the Court finds that

Guidant should have provided information about those workers within a departing

employee's "decisional unit" rather than about all employees nationwide who were

terminated.  Further, local vice presidents and managers played a key role in the

termination decisions. *See id.* ("Because the local authorities controlled the decision, the

localities accordingly constitute the appropriate scope for the informational

requirements.")  Accordingly, the Court finds that the various facilities constituted the

appropriate decisional level and finds that the Release is invalid on this basis.

Alternatively, the Court finds that even if the OWBPA permits a decisional unit to

be comprised of multiple corporations and various facilities, a question of fact exists

regarding whether Exhibit B should have included employees of Guidant Corporate and

its various United States-based businesses who worked in international facilities.

Plaintiffs point to evidence from Guidant's own witnesses that indicates that such

employees were considered for the RIF.  Guidant, on the other hand, points to evidence

that indicates that such employees were employed by foreign subsidiaries, not the

United States-based businesses, and were not considered for the RIF.  The Court finds

that the claimed decisional unit fails to satisfy the OWBPA and therefore grants summary

judgment in favor of Plaintiffs.

### C.        Disclosure of Selection Criteria

Next, Plaintiffs assert that Guidant failed to identify the eligibility factors for the

Plan.  The OWBPA states in relevant part:

> a waiver may not be considered knowing and voluntary unless at a
> minimum . . . the employer . . . informs the individual in writing in a
> manner calculated to be understood by the average individual eligible to
> participate, as to (i) . . . any eligibility factors for such program. . . .

29 U.S.C. § 626(f)(1)(H)(i).

Plaintiffs assert that the legislative history, the regulations, and the case law

support the conclusion that "eligibility factors" refers to the factors used to determine

which employees were selected for the program, not just the technical question of when

and how selected employees become eligible for severance benefits.  Plaintiffs assert that

the legislative history highlights Congress's concern with informing workers of the

criteria used to select them for termination programs:

> The principal difficulty encountered by older workers in these
> circumstances is their inability to determine whether the program gives rise
> to a valid claim under the ADEA.  In many circumstances, an older worker
> will have no information at all regarding the scope of the program or its
> eligibility criteria.  The informational requirements set forth in the bill are
> designed to give all eligible employees a better picture of these factors.

S. Rep. No. 101-263 at 34 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1539.  Further,

Plaintiffs cite *Commonwealth of Ma. v. Bull HN Info. Sys.*, 143 F. Supp. 2d 134 (D. Mass.

2001), and *Merritt v. First Energy Corp.*, No. 1:05-CV-00586, 2006 U.S. Dist. LEXIS

15089 (N.D. Ohio Mar. 31, 2006), for the proposition that the term "eligibility factors"

refers to "the factors used to determine who is subject to a termination program, not the

factors used to determine who is eligible for severance pay after termination." *Bull*, 143

F. Supp. 2d at 147 n.29.

Plaintiffs contend that Guidant did not give employees a document that explained

the eligibility factors that went into the decision to include them in the 2004 RIF.  Further,

Plaintiffs note that Guidant witnesses have given inconsistent answers regarding the

criteria used to select employees for the RIF.  For example, Plaintiffs note that Guidant

Vice-President of Human Resources, Wilson, testified that the criteria involved the

elimination of positions and did not include performance.  But Plaintiffs note that at the

operational level, other Guidant witnesses testified that performance was a criteria used.

In any event, Plaintiffs contend that Guidant never disclosed the eligibility factors in

writing.

In response, Guidant rejects Plaintiffs' assertion that the requirement to disclose

eligibility factors means that an employer must explain its reasons for selecting certain

employees for termination in the RIF.  Guidant notes that the regulations, 29 C.F.R.

§ 1625.22(f)(1)(iii)(B), provide that a "'program' exists when an employer offers

additional consideration for the signing of a waiver pursuant to an exit incentive or other

employment termination (e.g., a reduction in force) to two or more employees."  Based on

this regulation, Guidant contends that the "program" is not the reduction in force itself,

but rather the mechanism used to define who is eligible for severance benefits in exchange for signing a release.  Therefore, Guidant asserts that the "program" was the Severance Plan.  Guidant contends that it disclosed the eligibility factors related to severance benefits in both Exhibit B and the Severance Plan by disclosing that participants in the Severance Plan who received notice of a qualifying termination were eligible to receive severance benefits.  Further, Guidant asserts that providing a reason for the termination of employment for particular employees in a RIF could be harmful to the employees and a breach of confidentiality.

Guidant asserts that Plaintiffs rely on case law that is wrong.   In support of its position, Guidant cites *Kruchowski v. Weyerhaeuser Co.*, 446 F.3d 1090, 1094 (10th Cir. 2006) ("*Kruchowski II*"), in which the court revisited its decision in *Kruchowski v. Weyerhaeuser Co.*, 423 F.3d 1139 (10th Cir. 2005) ("*Kruchowski I*").  In *Kruchowski I*, the court held that Weyerhaeuser violated the OWBPA on two grounds:  failure to properly disclose the decisional unit and eligibility factors.  *Id.* at 1124–44.  On rehearing, the court omitted its holding that Weyerhaeuser violated the OWBPA by failing to disclose eligibility factors; instead, the court ruled that Weyerhaeuser violated the OWBPA only for failure to disclose the decisional unit.  *Kruchowski II*, 446 F.3d at 1095–96.  Although the Court takes pause to consider this omission in *Kruchowski II*, the Tenth Circuit Court of Appeals did not overrule *Bull*—the case on which it had relied in *Kruchowski I* when it held that Weyerhaeuser failed to disclose eligibility requirements. In *Kruchowski II*, the Court had already found that Weyerhaeuser violated the OWBPA

by failing to disclose the decisional unit and therefore did not need to address whether Weyerhaeuser also failed to disclose eligibility requirements. *See Kruchowski II*, 446 F.3d at 1095 (noting that a waiver is invalidated by the absence of even one of the OWBPA's requirements).

The Court agrees with the *Bull* court that eligibility factors refers to the factors used to determine who is subject to a termination program, not the factors used to determine who is eligible for severance pay after termination. Here, Guidant witnesses testified that both performance and job criticality were the eligibility factors used to determine which employees to select for the RIF. Guidant essentially admits that it did not disclose these factors to Plaintiffs. Guidant's failure to disclose the eligibility factors violated the OWBPA's information requirement.

Further, the Court rejects Guidant's argument that providing the reason(s) for selecting employees for the RIF could be harmful to the employees and a breach of confidentiality. In particular, Guidant contends that where an employee was selected for termination in a RIF because of performance, the employee would likely prefer that the reason for his or her selection not be listed in a disclosure. Additionally, at oral argument, Guidant stated that it would be difficult to list the reasons for employment termination for each of 700 employees and that doing so would encourage employees to bring defamation suits against the employer. (Tr. at 42.) These concerns are easily dismissed. The OWBPA does not require the employer to disclose which factor or factors led to each individual employee's selection for the termination program; rather,

the employer need only provide a short statement disclosing all eligibility factors

considered in general.  For example, Guidant could have simply stated in the introductory

paragraphs of Exhibit B that job criticality and performance were the eligibility factors

used to select employees for the RIF.  Accordingly, the Court finds that the Releases were

invalid as a matter of law and grants summary judgment in favor of Plaintiffs on this

basis.

### D.      Formatting Requirements:  Age and Job Grade

Next, Plaintiffs contend that the Release is invalid because Exhibit B fails to

adhere to OWBPA regulatory formatting requirements.  Specifically, Plaintiffs contend

that Guidant violated the OWBPA regulatory requirement concerning age and job title

disclosure.  The Court will address each argument in turn.

### i.      Age Disclosure

The regulations state, in relevant part,

> Information regarding ages should be broken down according to the age of
> each person eligible or selected for the program and each person not eligible
> or selected for the program.  The use of age bands broader than one year
> (such as "age 20-30") does not satisfy this requirement.

29 C.F.R. § 1625.22(f)(4)(ii).

Plaintiffs assert that Guidant failed to comply with this regulation because Guidant

did not disclose age.  Instead, Guidant disclosed date of birth, which Plaintiffs contend is

not synonymous with age.  Plaintiffs contend that under the regulatory scheme, it was

Guidant's burden to perform the calculations from birth date to age—not the employees'.

Plaintiffs point out that Guidant used age in the Project Apple Spreadsheet and therefore had this information.   Further, Plaintiffs contend that both the regulatory language and the example in 29 C.F.R. § 1625.22(f)(4)(vii) indicate that random presentation of age is inappropriate.   Plaintiffs also point out that Guidant's decision not to consolidate by age bands resulted in an intimidating 184-page document.

In response, Guidant asserts that it disclosed age in a manner that complies with the statute and its regulations.   Guidant contends that the OWBPA does not require use of numerical ages.   In fact, Guidant contends that a birth date provides more precise information than listing an employee's age.   For example, Guidant contends that providing birth dates allows employees to make calculations at whatever point in time they choose, such as date of notification, last date of work, or date of signature of the Release.   Guidant also contends that it properly did not use age bands and notes that the example in the regulation on which Plaintiffs rely is a suggestion, not a mandate. Additionally, Guidant points out that Pagliolo was able to calculate age from birth dates.

The Court finds that Guidant failed to properly disclose age under the OWBPA. Guidant's disclosure of age in Exhibit B was not presented in a manner calculated to be understood by the average employee signing the release.   Here, instead of disclosing age—which Guidant used in the Project Apple Spreadsheet—Guidant used birth dates. The use of birth dates, particularly in such a document as voluminous as Exhibit B, placed an unreasonable burden on the employee to compute each birth date to age. Additionally, the random presentation of age and failure to present the number of

employees selected in a one-year age band added to the difficulty in drawing meaningful conclusions from Exhibit B.  Although one Plaintiff took the time to calculate ages and organize the nearly 8,000 employees listed on Exhibit B, this fact does not prove that Guidant complied with the OWBPA.  Guidant made it unreasonably difficult for employees to determine whether they might have a possible age discrimination claim.  This failure renders the Releases invalid as a matter of law.  Accordingly, the Court therefore grants summary judgment in favor of Plaintiffs on this basis.

### ii.    Job Title

Plaintiffs also assert that Guidant violated the OWBPA regulatory requirement that full job title be disclosed.  The regulations require that, "[i]n a termination of persons in several established grade levels and/or other established subcategories within a job category or job title, the information shall be broken down by grade level or other subcategory."  29 C.F.R. § 1625.22(f)(4)(iii).  Plaintiffs contend that at Guidant, job subcategories are used and are significant.  Specifically, Plaintiffs allege that Guidant typically uses the words, "entry," "intermediate," "senior," and "principal" as the indicators of level within a given job title.  Plaintiffs assert that these gradations reflect differences in skill levels, entry requirement levels, and (to some extent) compensation levels.  Plaintiffs point out that, like age, "job grade" was readily available from the Project Apple Spreadsheet.  Plaintiffs contend that Guidant improperly used only the generic and not the specific job title.

In response, Guidant contends that it disclosed job titles in compliance with the

28

OWBPA.  Guidant contends that the regulations require employers to disclose information about established subcategories within job titles.  Guidant contends that it did this where such subcategories existed.  Guidant points out, for example, that Exhibit B lists 18 different subcategories of Engineers, 20 different subcategories of Specialists, and 23 subcategories of Technicians.  Guidant contends that Manager Level designations are not subcategories within job titles, and therefore it was not required to disclose them. Guidant contends that by using the job titles provided, Plaintiffs were able to locate themselves on Exhibit B.  Guidant also points out that Pagliolo was able to conduct his analysis using these titles, including a sub-analysis using the particular job titles.

The Court finds that Guidant failed to properly disclose job titles under the OWBPA.  Although Guidant may have included subcategories for some job titles, Guidant failed to disclose grade level.  Guidant does not refute that Guidant typically uses the words "entry," "intermediate," "senior," and "principal" as the indicators of level within a given job title.  Moreover, Guidant used this information on the Project Apple Spreadsheet.  The Court rejects Guidant's argument that it complied with the OWBPA formatting requirements because Plaintiffs were able to find themselves on Exhibit B. Plaintiffs already knew that Guidant was terminating their employment and finding themselves on Exhibit B does not necessarily help them evaluate whether to sign a Release.  Guidant's failure to disclose grade level renders the Releases invalid as a matter of law under the OWBPA.  Accordingly, the Court grants summary judgment in favor of Plaintiffs on this basis.

## CONCLUSION

The impacted employees did not execute the waivers knowingly and voluntarily because the Releases are invalid under the OWBPA.  Because the Releases are invalid as a matter of law, the Court dismisses Guidant's counterclaims for declaratory judgment (Count I) and breach of contract (Count IV).  Plaintiffs also assert that Guidant's counterclaims for unjust enrichment (Counts II) and Restitution, Recoupment, and Setoff (Count III) depend at least in part on the question of the validity of the Releases.  Therefore, Plaintiffs request that the Court include language in its Order that limits these counts to theories that do not depend on or assume the validity of the Releases as they pertain to ADEA claims.  The Court finds that this request is moot.

Accordingly, **IT IS HEREBY ORDERED** that**:**

1.      Plaintiffs' Motion for Partial Summary Judgment:  Invalidity of Releases (Doc. No. 13) is **GRANTED IN PART AND DENIED IN PART** as follows:

        a.      The Releases signed by Plaintiffs are void under the Older Workers Benefits Protection Act with respect to Plaintiffs' claims under the Age Discrimination in Employment Act.

        b.      Defendants' counterclaims for declaratory judgment (Count I) and breach of contract (Count IV) are **DISMISSED WITH PREJUDICE**.

        c.      Plaintiffs' request that the Court limit Defendants' counterclaims for unjust enrichment (Count II) and Restitution, Recoupment, and Setoff (Count III) to theories that do not depend on or

30

assume the validity of the Releases as they pertain to ADEA claims is

**DENIED WITHOUT PREJUDICE** as moot.

2.      Defendants' Motion for Summary Judgment (Doc. No. 17) is **DENIED**.

3.      At oral argument, Plaintiffs requested that the Court issue an order

permitting the immediate service of written discovery after the issuance of this Order.

The Court directs the parties to contact Magistrate Judge Susan Richard Nelson's

chambers at (612) 664-5490 within one week of the date of this Order to address

Plaintiffs' request.  The parties may request an expedited discovery schedule in light of

the amount of time that has passed since the terminations.  Of course, the parties are free

to meet and confer without contacting Magistrate Judge Nelson in order to expedite

discovery.

Dated:  April 4, 2007                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         Judge of United States District Court